The next case up is Torres v. Sheriff Rod Howell. We'll hear first from Mr. Hanson. Good morning. Dylan Hanson on behalf of Appellants Alicia and Alfonso Torres. May it please the Court. This appeal arises from the United States District Court for the Middle District of Georgia, granting summary judgment to appellees on Appellants 1983 claims, specifically against Deputy Joshua Luke. The District Court's judgment must be reversed for the following reasons. The District Court erred when it determined that decedent Peter Torres' constitutional rights under the Fourth Amendment were not violated when he was shot by Deputy Luke. As a result of this determination, the District Court erred in determining that Deputy Luke was thus entitled to qualified immunity. Now, as per the standard of review, a granting of summary judgment is reviewed de novo with all evidence viewed and all factual inferences drawn in favor of the nonmoving party. In its ruling, the District Court first analyzed whether Deputy Luke was entitled to qualified immunity. Now, the appellants do not dispute that Deputy Luke was acting within his discretionary authority, so thus the appellants had the and two, that said right was clearly established. However, the District Court held that the appellants were unable to show that Peter Torres' Fourth Amendment rights were violated, so I'll begin there with the first prong of whether there was a violation of a constitutional right. For excessive force as a Fourth Amendment violation, the test is whether said force was objectively reasonable. And the case law in this area uses three factors to weigh the against the government's interests. The first factor is the severity of the crime at issue. The second is whether the suspect poses an immediate threat to law enforcement officers or others in the area. And the third is whether the person is actively resisting arrest or attempting to flee. So I'll go through each of these. But ultimately, the District Court held that all three of these factors weighed against Peter Torres and that no factor presented an issue of material fact, which appellants contend was error. Can you focus on the second one, please? Yes, whether he posed an immediate threat to law enforcement officers. Yes. Yes, I do have the most discussion about that one. But briefly, for the first one, the severity of the crime at issue in the light most favorable to appellants, I would just say that Peter Torres was suspected of committing a misdemeanor offense. And this was even noted in the order granting summary judgment in the District Court that he committed a misdemeanor assault and that it did not rise to a felony. And when a person is suspected of committing a misdemeanor offense, this factor generally weighs in favor of the suspect, as noted. And several decisions by this court. Although at the time, the officers were told that your client was under the influence of drugs, possibly harmed with a knife, and had been involved in physical domestic violence, right? Correct. That is correct. But the first statement by dispatch as to weapons was that he may have a weapon, I believe was the first statement. As Deputy Luke and the other deputy, I believe his name was Deputy Perry, as they were on the way to the residence, dispatch corrected it and said, no, he does not have any weapons. Did Luke hear that? Yeah, I believe so, yes. They were both on the way. Or was that put to the dispatcher in terms of a question? Uh, um, Deputy Perry asked and the dispatcher answered. But when the dispatcher answered, did it go to all the forces, as it were? It did. And Deputy Perry and Deputy Luke arrived at the residence at the same time. Well, I knew that. I was curious as to whether Luke heard that. He did. I believe he did, yes. Okay. So as for the second factor, whether the suspect poses an immediate threat to law enforcement officers in the light most favorable to appellants, Peter was found by Deputy Luke sitting in a chair, slumped over, appeared to be passed out just based on appearance. But at the time that the shooting occurred, there had been, he did throw a tray at him, and then there was a propane tank. I'd like to hear what you think happened with the propane tank. When Deputy Luke found him, he was slumped over in the chair. There was some sort of metal tray down alongside Peter. He did grab that tray, but appellants contend that the video speaks for itself and that he slung the tray to the side. It was not slung at Deputy Luke. It didn't end up anywhere near Deputy Luke. It was rather mild, just slinging the tray. The propane tank, he did grab it as he stood up from the chair. However, he held it maybe a couple seconds before he released it. The propane tank was attached to another object by a hose, so he did not have it in his hands when he was shot. He did ultimately move toward Deputy Luke, and this was despite Deputy Luke's commands for Peter to stop. However, given the information that Deputy Luke had received, combined with Peter's physical state, should have alerted Deputy Luke that Peter was not a significant threat. By that, I mean his state of intoxication, his appearance when Deputy Luke first saw him slumped over, appearing to be on the verge of unconsciousness, hands down by his side, hands visible. Let me ask you, if I could, about the propane tank again. I've looked at the video multiple times, and I can't tell exactly how he picks it up. Is it with one hand, two hands? It looks like it's too big to pick up with one hand. Is it with two hands? Can you tell? It's hard to tell because there becomes a point in the video where the camera starts shaking a good bit, and after that, it's hard to tell with any certainty what happened with any particular item in the video. But from my recollection, it appears that he picked it up with one hand. I don't know if it was empty or not, but either way, he did not carry it to Deputy Luke. He dropped it after a couple of seconds of picking it up. So, that combined with the information Deputy Luke had received, including the fact that... I'm sorry, one more thing about the propane tank. How much time do you think expired between when he put the propane tank down and when he was shot? Maybe three seconds, give or take a second. Thank you. No more than five. But that combined with the knowledge that Deputy Luke had that Peter did not have a weapon should have alerted Deputy Luke that Peter was not a significant threat. Why would he ask him to put up his hands? Well, Deputy Luke... I thought the inference from that is that he may have a weapon that he can get a hold of right away, either in his hands or in his pocket or something or other. Right. And Deputy Luke testified that he couldn't see his hands, but it appears on the video... No, no, no. The question is why he asked him to raise his hands in the first place. Well, I suppose it was to see if he had anything in his hands, such as a weapon. But the last information that Deputy Luke was given was that he did not have any weapons. Well, we don't know when he didn't have the weapon. I mean, the dispatcher says the occupants, as I understand it, had left. They were in the vicinity, but not there. Right. And we don't know. Do we know when the dispatcher got the information and from whom and when it was that he wasn't in terms of time that the dispatcher meant he didn't have a weapon? I don't know with certainty the approximation in time from when that information was given. Well, but the first thing that Luke heard is he probably that he may have had a weapon. Yes. That he may have a weapon. Then that was corrected sometime later while Deputy Luke was on the way. And it said that Peter does not have weapons. That information, I believe, was given to dispatch from the family. Well, at the very least, Luke wasn't when he asked him to show his hands, he will not take a risk that the dispatcher is wrong. The first question that or the first statement that Deputy Luke made was don't move. And that was when Peter was in the chair, slumped over, hands down. He then began to move. And that is when Deputy Luke pulled his gun and said, let me see your hands. The video, though, I mean, you can see Peter's hands in the video. And, you know, from the and I know there's a slight angle disparity from a chest cam to eye level. But, you know, to me, looking at the body cam, you can see Peter's hands and it looks pretty clear that he doesn't have anything that combined with the information that he didn't have a weapon combined with his state of intoxication in appellants, you should have alerted Deputy Luke that he did not have a weapon. There was no indication that he had a weapon, no reason to believe that he had a weapon at any time. Additionally, Peter was 5'9", 200 pounds. Deputy Luke was 6'6", 260 pounds. That further lends itself to the conclusion that Peter was not a serious threat to Deputy Luke. So under this test, the district court erred by failing to consider the facts in the light most favorable to appellants weighing all three factors in favor of Deputy Luke and determining that no issues of material fact existed. Now, there is another test that was discussed in more recent decisions in this court. And that test is for whether an officer may reasonably use deadly force. And in that test, deadly force is permitted only if the officer, one, has probable cause to believe the suspect poses a threat of serious physical harm. Two, that the officer reasonably believes that deadly force is necessary. And three, the officer is given some warning regarding deadly force if feasible. Now, all three of those elements need to be satisfied for deadly force to be rendered reasonable. Now, applying this three-part test to the facts, Peter did not pose a threat of serious physical harm. As I stated, he was unarmed, slouched over, appeared to be asleep based on the video. And Deputy Luke was aware that Peter was unarmed and that he was intoxicated. And for those same reasons, Deputy Luke's belief that to be reasonable as a matter of law, there is a case, Perez v. Szyzynski. That is a case from this court decided in 2016. This court held that an officer's subjective belief is not relevant to this inquiry. The standard is whether the use of force is objectively reasonable. And Appellee's attempt to use Deputy Luke's belief that Peter may have had a weapon as a primary factor justifying Deputy Luke's use of deadly force. However, this court in Perez held that, and I'm going to quote from the case, an officer's beliefs about his life being in danger are just that, his beliefs. They are not facts and circumstances that we may rely on to objectively determine the reasonableness of his actions. And therefore, Deputy Luke's beliefs are not relevant and were improperly considered by the District Court. There was no articulable reason for him to believe that Peter had a weapon. He was told that Peter did not have one. What does Luke know about the occupants and the residents? Who they are? The two ladies, the second lady is 20 years old with a child. Does he know about that? And the Torrey's parents are there in the district. Does he know anything about the boyfriend? I understand the boyfriend arrived at some point in time. So what does he know about all of that? I'm not sure that Deputy Luke knew much of anything about that. So what he has is a house with a bunch of people in it. He doesn't know how many. Well, there was one dispatch that said that all the occupants are waiting out by the road. Well, I understand how many all the occupants means. We don't know. He doesn't know. Right. He knows it was a house that had a bunch of occupants and that Torres was in the house and was threatening. That's the initial thought was some kind of weapon. Right. And at some time between then and the second dispatch, which was about the time they were there, the occupants had gotten out. Right. Right. But we don't know how many occupants had gotten out. Right. In the most, the more recent. Whether Torres is still there or whatever. Right. And the more recent transmissions were that the occupants were, other than Peter, were out by the road. Well, we just know occupants. We don't know whether that included the party who was threatening the occupants. Right. Yeah. They did not know where Peter was as far as far as Luke is concerned, the occupant could have been with the others who left. Right. And just to respond to that, Deputy Luke, he testified that they did not know where Peter was. You can see on his body cam, he arrives at the residency, immediately believes or immediately begins walking around back just looking for him. And he just happens upon him. And I'll reserve the remainder of my time if there's no other questions. Thank you, Mr. Hanson. You'll have two minutes for rebuttal and we'll hear from Mr. Rollins. Thank you, Your Honor. My name is Raleigh Rollins and I'm here today on behalf of the defendant's appellees in this case. May it please the court. In its most recent opinions involving qualified immunity in the Fourth Amendment arena, the Supreme Court has said that facts are important, that facts should not be judged from a high level, but the specifics of the facts should be considered. And to your point, Judge Shifflap, on the day this incident occurred, Deputy Luke and Deputy Perry were working for the Colquitt County Deputy Sheriff. At some point, they get a message from dispatch that says 135 Blackberry Lane, 135 Blackberry Lane, reference to a 1016 physical. It's going to be the complainant's brother, Peter Torres. He's going to be physical with everyone in the house. 1016 is a code for domestic dispute. At that point, Deputy Luke and Deputy Perry started driving towards the residence at 135 Blackberry Lane. On the way to the residence, the dispatcher stated, be advised he could possibly have a weapon, possibly a weapon, possibly a knife, also possibly on 1035. 1035 is code for under the influence of narcotics. What is that? Under the influence of narcotics. Oh, all right. Yes. So as the officers continued toward the residence, the dispatchers stated, central to units responding to Blackberry Lane, be advised the rest of the family is going to be 1012 by stop sign in a black Ford truck and in a Chevy Cruze. They advised the offender was chasing after them. As the officers got closer to the residence, Deputy Perry asked the dispatcher, is the offender still chasing them? In response, the dispatcher stated, negative and he doesn't have any weapons, just advised that he has trashed the house. Although they were in separate vehicles, Deputy Luke and Deputy Perry arrived at the house at the residence at approximately the same time. Following their arrival, Deputy Perry walked to the front door of the residence and Deputy Luke walked to the rear of the residence. That is where the video picks up. Can I ask you some questions about the video? Yes. With respect to the propane tank, I'm going to ask you the same questions that I asked your friend over here. Can you tell from watching the video whether the deputy picked up the propane tank with one hand or two hands? Mr. Torres, Your Honor, I think picked up the... I'm sorry. Yes, Mr. Torres. Thank you for the correction. By my viewing, I thought he picked it up with his left hand as he stood up with just one hand. All right. Thank you. Okay. Excuse me. As you can see in the video, at 618.58, and time is important here, at 1658, excuse me, 1618.58, Deputy Luke spoke to Mr. Torres. Deputy Luke said, boss man, don't move. During the ensuing seconds, Luke twice repeated, don't move. However, instead of complying with that, as you can see from the video, Mr. Torres raises his head, leans forward, and then with his right hand, throws the tray. As Mr. Torres was grabbing and throwing the tray, at that point, Deputy Luke drew his weapon. At this point, Mr. Torres is approximately 20 feet from Deputy Luke. After he drew a service weapon, Deputy Luke again instructed Mr. Torres to quit moving. After he was instructed to quit moving is when Mr. Torres picked up a propane tank, probably with one hand as I see it, and then... Which hand do you think that was? I think it's his left hand. I think he throws the tray with his right hand and picks up a propane tank with his left hand. Okay. As he's standing. So that being the case, and all of this is empty once he gets rid of the tray and he gets rid of the propane tank. Agreed. Although that does not answer the question to whether he has a knife in his pocket or in the immediate vicinity. I think it's reasonable from the video that when he stands up, you could say he does not have a knife, but that does not mean he does not have a knife when he is chasing Mr. Deputy Luke. But it would be fair to say he doesn't have a knife out or in his hands at that time. I agree that is true. Yes. But as you can see from the video, he runs towards Deputy Luke. And Deputy Luke, to my way of thinking, does what he's supposed to do and tries to de-escalate the situation by getting away from him. I think what he testified was my idea was I was going to go use my patrol vehicle as a barrier to put between me and Mr. Torres who's approaching me. Unfortunately, Mr. Torres, there's this question about him being too intoxicated. He is moving very rapidly for a man who is intoxicated and he is gaining on Deputy Luke. As you can see from the video, when Deputy Luke turns around, Mr. Torres is two to three feet behind him and that is when the shooting occurs. And to Deputy Luke's point, when he is moving backwards towards retreating towards his patrol vehicle, he cannot see Mr. Torres' hands as Mr. Torres is running. But Your Honor, to my mind, you know, the question is, does he pose a threat of serious harm? If Mr. Torres gains access to Mr. Deputy Luke's person, he gains access to Deputy Luke's gun, his firearm, his baton, his whatever other items he had on him. That becomes a very lethal situation. So the question of whether he had a knife or didn't have a knife, I think he still posed a threat of serious harm to Deputy Luke whether he did or he did not. I think that it is reasonable to assume that that is a threat of serious harm as far as the reasonableness inquiry goes for the Fourth Amendment question. And for that reason, I don't believe, much like the district court found, that a constitutional violation occurred. However, in the qualified immunity setting, as the court well knows, even if a constitutional violation did occur, that does not end the inquiry. The question is, did Deputy Luke violate clearly established law? And again, going back to the Supreme Court's most important question, did he use excessive force? If no reasonable officer would have engaged in the acts of Deputy Luke, then it seems to me that that answers the question of whether it was established that he used excessive force. Your Honor, that was not the way that I read the Supreme Court's recent cases. It was my understanding that what they were saying was that there has to be a prior case. There has to be a case with similar facts. So I agree in general. I mean, I think that's clear. That's what the Supreme Court has said. And so, for example, you know, in a dog bite case or something, you might have a person where the dog is released on somebody, and it's somewhere between the two extremes of cases that we have in our circuit about dog bite cases. And whether there's excessive force, one extreme says no excessive force, and the other extreme says yes, that was excessive force. In this case, I mean, firing a gun, if there wasn't reasonable cause to fire a gun and use deadly force, and no reasonable officer would have used a gun under those circumstances, it seems to me like we also, just in this specific context, have the clearly established question answered. And you're saying we don't, which you might be right, so I'm asking you to explain why that is. Including the two most recent cases, it seems that the Supreme Court, I think they've used the word reiterated, that there has to, that particularly in the Fourth Amendment context, that the facts have to be sufficiently similar that it would give an officer the information that he needs to give him fair warning. And you're right. I mean, I guess in those two short opinions that were issued, I think they both involved, or one of them involved deadly force. Yes. That was the gentleman holding the hammer, I believe. Right. Although that's slightly different, right? Because, I mean, he's holding a hammer. It is. And I think, I think it is reasonable to watch the video and think that Deputy Luke is being attacked. I mean, this is not, Deputy Luke did not initiate the conduct, so to speak. Mr. Torres runs at him. And Mr. Torres, even when Deputy Luke retreats, continues to pursue him. You can hear right before the shot is fired, Deputy Luke says quit. But Mr. Torres doesn't, he doesn't change his direction, he doesn't change his speed, and he doesn't give any other indication that he is varying his, what appears to be his intent to make physical contact with Deputy Luke. And whether he has a knife or doesn't have a knife, once he makes physical contact with Deputy Luke, Deputy Luke is in, there is a threat of serious harm to him. And for that reason, Your Honor, again, that's why I think a constitutional violation did not occur. But I don't think you can point to a case where an officer is being attacked, where this court or the Supreme Court has said, no, you are not authorized to use deadly force. And for that reason, I would submit to you that because it is not clearly established, because a court has not said, when an officer is being attacked, deadly force is not appropriate, that there is no, that Deputy Luke is entitled to qualified immunity on that issue. I mean, I think that, I think it's, if there's not, if an officer is having deadly force used against him, then there's no question, of course, he can use deadly force in response. But if an officer is being attacked, I think, you know, if he has no weapons, that factors into the analysis here. I think that has to be true. But when the Deputy's weapon is drawn, right, it is out of a holster. And you have a situation where, you know, what's going to happen here? You know, what's going to happen when Mr. Torres makes contact with Deputy Luke? You know, the gun's in play at that point. And, you know, you have a situation where a gentleman is charging a person who is pointing a weapon at him. I mean, that, to me, in and of itself, is dangerous. When you have a person who we understand to be under the influence of narcotics running at you while you have a weapon drawn, to my mind, that presents a serious risk of harm to the officer. If there are no further questions, I will cede the balance of my time. Thank you very much, Mr. Rollins. We'll hear from Mr. Hansen. As for the element regarding the clearly established law, I just want to address very briefly that it was not addressed by the District Court as it did not get that far in the analysis. There are two cases that appellants cited in their brief, that being Gilmere v. City of Atlanta and Smith v. LaPage. And both of those appellants contend are both factually similar, that it was clearly established at this time to put Deputy Luke on notice that his actions would have violated the rights of Peter Torres. We're not here today to ask this court to determine that a constitutional violation occurred. We are asking this court to determine that an issue of fact exists as to whether a constitutional violation occurred and that this case is worthy of determination by a jury in that regard. They also point to Peter being an immediate threat to Deputy Luke's safety to justify Deputy Luke's use of deadly force. There was a case, Pace v. Capobianco. That's an 11th Circuit case from 2002 in which this court held that the immediate threat factor can be described as whether, given the circumstances, the suspect would have appeared to reasonable officers to have been gravely dangerous. And Peter was simply not gravely dangerous in this encounter. He was moving towards Deputy Luke. But, again, and I'll reiterate, there was no evidence to suggest that Peter ever had a weapon. The first transmission that he may have was then overcome by the following statement that, no, actually, he does not have a weapon. So there was no articulable reason for Deputy Luke to ever believe that Peter had a weapon. For those reasons, the district court erred and we respectfully ask this court to reverse the district court's grant of summary judgment to appellees. Thank you very much, counsel. Thank you. All right.